Criminal Case Template







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



MARCUS FRANKLIN, A/K/A
MARCUS EMMANUEL BLACK,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§

§

§

§

§

No. 08-03-00491-CR

Appeal from the

205th District Court

of El Paso County, Texas

(TC#20030D03387)




MEMORANDUM OPINION
           Marcus Franklin pleaded guilty to possession of less than one gram of cocaine. 
In accordance with a plea agreement, the trial court deferred adjudicating his guilt and
placed him on community supervision for two years. Franklin appeals the denial of his
written pretrial motion to suppress evidence. We conclude that the trial court did not err
in denying the motion to suppress. Therefore, we affirm the judgment.
Factual Background
           On July 3, 2003, the El Paso Police Department had an active arrest warrant
charging Franklin with assault. Officer Phillip Amato testified that at approximately 2
a.m. he called Officer Frank Rodriguez to assist him in executing the warrant. When they
arrived at Franklin’s house, Rodriguez went towards the back and Amato went to the
front door. Using a cell phone, Amato called Franklin and asked him to come to the door. 
 When Franklin opened the door, Amato smelled a very strong odor of marijuana coming
from the residence and on Franklin’s breath. He asked Franklin if he could step inside the
house and Franklin said that he could. Once inside, Amato informed Franklin that he had
a warrant for his arrest. Amato also radioed Rodriguez and asked him to come around to
the front.
           Rodriguez indicated that another person might be in the house, so Amato asked
Franklin if they could look around. Franklin was hesitant at first, but after they talked to
him a little longer, he acquiesced. Amato asked Franklin whether there was anyone in the
back room. Franklin claimed that he was the only person in the house and that he did not
have keys to get into any of the other rooms. With Franklin’s consent, Amato tried to
open the door using a credit card, but was unsuccessful. Franklin then knocked on the
door and instructed his girlfriend, who was on the other side, to open the door. The
girlfriend opened the door, the officers walked in, and Amato saw an open cigar box on a
couch. He also saw miniature “baggies” containing a white, powdery substance in the
box and on the floor near the couch. Amato testified that he recognized these bags as the
type used to package drugs. According to Amato, the officers did not have to move
anything to see the bags.
           Amato testified that he wanted to search the back room because he suspected that
someone might be destroying evidence there. But when asked whether he was searching
for anything, he responded, “Mostly people.” Although Franklin had been patted down,
Amato did not really feel safe, because he knew someone was in that room.
           Amato admitted that the police department has written forms that can be signed to
demonstrate consent to search, but stated that he “may have ran out of them” that
morning. When talking to Franklin, Amato testified that he used a normal tone of voice
and did not threaten him or promise him anything. But he was not sure whether he
unholstered his weapon or whether he told Franklin that they would get a search warrant
if he did not consent to a search. He did not tell Franklin that he could refuse consent.
           Amato testified that Franklin was effectively under arrest as soon as Amato walked
into the house, but he was not handcuffed until after they found the cocaine. Amato
stated that he ordinarily reads a person his rights when he asks questions or when he
handcuffs him. He admitted, however, that he did not read Franklin his rights when he
questioned him about the marijuana and about who else was in the house.
           Officer Rodriguez testified that while he was watching the back of the house he
noticed some movement in a back bedroom. When Amato called him to the front, he
found Amato and Franklin standing just outside the front door of the house. As he
approached them, Rodriguez smelled marijuana. When the officers questioned Franklin
about the marijuana, he initially denied any involvement with it. Eventually, however, he
stated that he had “smoked it all.” Rodriguez testified, “We let him know that we didn’t
believe him. That, you know, we thought maybe he had some on him or inside the
residence. And at that point he goes, like, No, you can check.” Franklin mumbled and
his speech was a little slow. Rodriguez patted him down, but found no weapons or
contraband.
           After the officers entered the residence, Franklin claimed that there was no one in
the back bedroom and that the door was locked. Although Rodriguez stated that Franklin
did not seem threatening, he testified that they were interested in checking the back
bedroom for people “for protective reasons.” He testified, “[W]e let him know, you
know, we pretty much think there is someone inside, or you had been in that bedroom. 
And he repeatedly told us, you know, I have no access to that bedroom. My parents lock
it.” Rodriguez then called Franklin’s father to verify what Franklin was saying. At that
point, Franklin stated that his girlfriend was in the room and that he did not want her to be
involved. Nevertheless, Franklin knocked on the bedroom door and told his girlfriend to
open it. The girlfriend opened the door, the officers walked in, and “in plain view” saw
some small plastic baggies on the floor, on the couch, and inside an open cigar box that
was on the couch. The bags contained a white, powdery substance. Rodriguez testified
that these types of bags are often used to carry drugs.
           Rodriguez stated that the officers spoke to Franklin in a professional, calm tone
and that there was nothing aggressive about the encounter. They did not unholster their
weapons. The officers did not threaten Franklin in any way, promise him anything, or tell
him that they would get a search warrant if he did not consent to the search. Franklin was
not handcuffed, but the officers did not intend to let him leave. Rodriguez did not ask
Franklin to sign a consent-to-search form, nor did he recall informing Franklin that he
could refuse consent. Rodriguez admitted that it could have been possible to get a search
warrant.
           Franklin testified that when Amato called, he was in the back bedroom, which he
shared with his girlfriend. He opened the “hard door” and Amato asked him to step
outside because he had a warrant for Franklin’s arrest. Franklin opened the screen door,
shut the hard door behind him, and stepped outside. When he turned around to get his
shirt, Amato followed him inside the house without asking for Franklin’s permission. 
Amato told him that he could smell marijuana and then began looking around the living
room--lifting up the couches and moving papers. At first, Franklin told Amato that he
had not been smoking marijuana, but eventually admitted that he had been smoking it
outside because his father did not allow him to smoke it inside the house.
           Rodriguez arrived and handcuffed Franklin. When the officers inquired about the
back bedroom, Franklin told them that it was his father’s room and that it was locked. He
did not tell them that his girlfriend was in there. One of the officers tried to open the door
with a credit card. When that was unsuccessful, he asked Franklin if he could get inside
the room. Franklin told him, “Yes, I could get inside of the room. I would just have to
ask my girlfriend.” Franklin initially testified that he let the officers inside the room
“because they were about to tear my door off.” Later, he testified that one of the officers
stated that, “if you give me permission to search, I won’t hit you with any charges.” The
prosecutor asked, “Oh, okay. So he told you, [a]s long as you let us know there’s drugs
inside, we won’t arrest you for those drugs?” Franklin responded, “Yes, sir.”
           Once his girlfriend opened the door to the back bedroom and turned on the light,
the officers went inside and began searching. They did not request permission to search
until after they had already searched for awhile. When they noticed the cigar box, one of
the officers called a lieutenant and asked for a canine unit. The lieutenant refused. The
officers then asked if they could look inside the cigar box, which was closed. Franklin
testified that he “agreed and said that it was okay to search.” There were some baggies
laying around, but they were empty.
           Franklin testified that he was nineteen at the time of the hearing. The officers did
not yell at him, rough him up, or unholster their weapons. He was not read his rights until
he arrived at the police station and never signed any forms. The officers did not tell him
that he could refuse consent to search and he did not know that he could.
Standard of Review
           We apply a bifurcated standard of review to a trial court’s ruling on a suppression
motion. We give almost total deference to the trial court’s determination of historical
facts, but we evaluate de novo the court’s application of search-and-seizure law. 
Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). If, as in this case, the
trial court does not make explicit findings of historical fact, we view the evidence in the
light most favorable to the court’s ruling. Id. at 327-28. This means that we assume that
the trial court made implicit findings, supported by the record, that buttress its ruling. Id.
at 328. At a suppression hearing, the trial court is the sole fact finder and judge of the
credibility and weight of the evidence; therefore, the court may choose to believe or
disbelieve all or any part of a witness’s testimony, even if that testimony is
uncontroverted. State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).
Discussion
           Franklin argues that the search of his residence was unreasonable under both the
United States and Texas Constitutions because it exceeded the scope of a search incident
to arrest, was unrelated to exigent circumstances, and was unsupported by probable cause
or voluntary consent. For the reasons explained below, we conclude that the trial court
could have reasonably found that Franklin voluntarily consented to the search. Therefore,
we need not consider whether there is any other justification for the search.
The Law Governing Consent to Search
           Consent is a well-established exception to the constitutional requirements of both a
warrant and probable cause. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct.
2041, 2043-44, 36 L.Ed.2d 854 (1973); Carmouche, 10 S.W.3d at 331. The Supreme
Court has noted, “In situations where the police have some evidence of illicit activity, but
lack probable cause to arrest or search, a search authorized by a valid consent may be the
only means of obtaining important and reliable evidence.” Schneckloth, 412 U.S. at 227,
93 S.Ct. at 2048.
           To be valid, consent must be voluntary, and voluntariness is a fact question to be
determined from all the circumstances. Id. at 227, 93 S.Ct. at 2047-48; Carmouche, 10
S.W.3d at 331. Consent must be positive, unequivocal, and not coerced by explicit or
implicit means. Schneckloth, 412 U.S. at 228, 93 S.Ct. at 2048; Carmouche, 10 S.W.3d at
331; Allridge v. State, 850 S.W.2d 471, 493 (Tex. Crim. App. 1991). Some factors that
may be considered to determine the voluntariness of consent are the youth, education, and
intelligence of the accused; the constitutional advice given to the accused; the length of
the detention; the repetitiveness of the questioning; and the use of physical punishment. 
Schneckloth, 412 U.S. at 226, 93 S.Ct. at 2047; Reasor v. State, 12 S.W.3d 813, 818 (Tex.
Crim. App. 2000).


 Although the United States Constitution only requires the State to
prove the voluntariness of consent by a preponderance of the evidence, the Texas
Constitution requires the more exacting standard of clear and convincing evidence. 
Carmouche, 10 S.W.3d at 331.
           Consent is not established by showing no more than acquiescence to a claim of
lawful authority. Bumper v. North Carolina, 391 U.S. 543, 548-49, 88 S.Ct. 1788, 1792,
20 L.Ed.2d 797 (1968). But consent is not rendered involuntary merely because it is
given while the accused is under arrest. Johnson v. State, 68 S.W.3d 644, 653 (Tex.
Crim. App. 2002). Likewise, an officer is not required to inform the accused that he can
refuse consent to search, and knowledge of the right to refuse is not a prerequisite of
voluntary consent. Schneckloth, 412 U.S. at 232-33, 93 S.Ct. at 2050; Johnson, 68
S.W.3d at 653. An officer’s failure to inform the accused that he can refuse consent is,
however, a factor to consider in determining voluntariness. Johnson, 68 S.W.3d at 653. 
Application of the Law to the Facts of this Case
           Viewing the evidence in the light most favorable to the trial court’s ruling and
considering that the trial court could believe or disbelieve all or any part of a witness’s
testimony, the trial court could have made the following implicit findings. The officers
arrived at Franklin’s house to execute a valid arrest warrant. They smelled marijuana in
the house and on Franklin. Franklin agreed to let them enter the house and to open the
door to the back bedroom. The evidence was in plain view once the door to the bedroom
was opened.


 The officers wanted to obtain access to the bedroom to ensure their safety.
They did not raise their voices, unholster their weapons, threaten Franklin, or make him
any promises. They did not handcuff Franklin until after they found the evidence, but he
was effectively under arrest and not free to leave. The officers did not read Franklin his
rights, tell him that he could refuse consent, or obtain a signed consent form.
           These implicit findings are similar to the facts in Johnson. In that case, at least
four officers arrived at the appellant’s apartment with a warrant for his arrest. When the
appellant opened the door, an officer informed him that he was under arrest. Id. at 652.
The testimony supported the trial court’s implicit finding that the officers did not
effectuate the arrest with their guns drawn. Id. at 653. The officers handcuffed the
appellant and conducted a protective sweep of the apartment to ensure that no victims or
other perpetrators were there. Nothing was found during the protective sweep. Id. at 652.
A sergeant asked the appellant for permission to search the apartment and the appellant
said, “‘Sure, go ahead’ and ‘Yeah, man, you can search. That’s my room back there.’” Id. 
The sergeant testified that no threats were made, no Miranda warnings were given, and
no consent-to-search form was signed. He claimed that he did not have a consent form
with him and it would have been impractical to get one because the victim was still
missing and might have been in the apartment. The appellant was not told that he had the
right to refuse consent. Id. Under these facts, the Court of Criminal Appeals held that the
trial court did not err in finding that the consent to search was voluntary. Id. at 654.
           Similarly, in this case, Franklin was under arrest, but the officers did not unholster
their weapons. He agreed to let the officers in the back bedroom in response to a request
from the officers. No threats were made, no Miranda warnings were given, no consent-to-search form was signed, and no information regarding the right to refuse consent was
provided to Franklin. In Johnson, unlike in this case, the appellant was handcuffed when
he gave consent. Nevertheless, the Court of Criminal Appeals upheld the trial court’s
finding of voluntariness.
           Franklin points out that he did not agree to let the officers in until after they had
repeatedly asked for permission. He also asserts that the officers could not remember
exactly how or when his consent was obtained. However, both of the officers clearly
testified that Franklin consented to let them look around the house and to enter the back
bedroom and that no threats or promises were used to procure the consent. Although the
officers’ persistence in seeking consent is a factor to consider in determining
voluntariness, it does not render Franklin’s consent involuntary under the totality of the
circumstances of this case. See Martinez v. State, 17 S.W.3d 677, 683 (Tex. Crim. App.
2000) (officer’s testimony that no coercion was used is evidence of voluntariness). We
also note that Franklin did not contend in his testimony that the officers’ persistence
influenced him to consent. Instead, he claimed that he allowed them into the back
bedroom because he thought they would break the door down or because they promised
him that they would not arrest him for anything they found in there. This testimony was
contradicted by the officers, and the trial court obviously resolved the resulting credibility
dispute against Franklin.
Conclusion
           For the reasons stated herein, Franklin’s sole issue on appeal is overruled, and the
judgment of the trial court is affirmed.
 
                                                                  SUSAN LARSEN, Justice
December 16, 2004

Before Panel No. 1
Larsen, McClure, and Chew, JJ.

(Do Not Publish)